UNITED STATES DISTRICT COURT

**05** **10663 GAO**

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MARILYN BYRNE, | ) | |
| Plaintiff | ) | |
| | ) | |
| VS. | ) | **CIVIL ACTION** |
| | ) | **NO.** |
| BOSTON MUTUAL LIFE | ) | |
| INSURANCE COMPANY, | MAGISTRATE JUDGE _____ | |
| Defendant | ) | |

RECEIPT # _____
AMOUNT $_____
SUMMONS ISSUED_____
LOCAL RULE 4.1_____
WAIVER FORM _____
MCF ISSUED_____
BY DPTY. CLK._____
DATE _____

**COMPLAINT**

## PARTIES

1.    The Plaintiff, **MARILYN BYRNE** , is an adult individual, born December 6,

1944, and is a resident of the Town of Barnstable, Barnstable County, Massachusetts.

2.    The Defendant, **BOSTON MUTUAL LIFE  INSURANCE COMPANY**,

is a business corporation engaged in the business of insurance, with a principal place

of business in the Town of Canton, Massachusetts, and is registered and/or

licensed as such with the Massachusetts Division of Insurance.

## DECLARATION OF FACTS

3.    At all times relevant, prior to and including March 1998, the Plaintiff was an

employee of the Cape Cod Hospital, Hyannis, Massachusetts, working as a

medical records clerk, earning $665 per week before taxes.

4.    As of March 1998, and at all times relevant thereafter, the Defendant was

engaged in the business of insurance in the Commonwealth of Massachusetts, and

was providing group long term disability (LTD) coverage for employees of the

Cape Cod Hospital, under Policy No. 50187-03, Certificate No. 015342565, effective September 1, 1994. (A true copy of said group LTD policy is attached hereto as Exhibit A).

5.  The Cape Cod Hospital's LTD policy was part of an employee-benefit plan as that term is used in 29 U.S.C. Sect. 1001, et seq., known as the Employee Retirement Income Security Act (ERISA), and the administration, interpretation and enforcement of said LTD policy are subject to the terms of the ERISA statute.

6.  As of September 1, 1994, and at all times relevant thereafter, the Plaintiff Marilyn Byrne was an eligible employee under the Cape Cod Hospital's group LTD policy.

7.  The aforesaid Policy No. 50187-03 (Exhibit A attached hereto), sets forth the rights and obligations of the both the Plaintiff and the Defendant under the long term disability coverage provided by the Defendant to employees of the Cape Cod Hospital.

8.  The disability coverage provided by Defendant under said LTD policy includes an own-occupation disability benefit for the first 24 months of disability preventing the employee from performing the material duties of her regular occupation, subject to a 180-day elimination period, and a continuing benefit after such 24 months of own-occupation disability where the employee is prevented from performing any occupation for which she may be reasonably qualified by training, education or experience.

9.  The employee's benefit under the Cape Cod Hospital's group LTD plan is calculated at sixty percent (60%) of basic monthly earnings.

10.     An eligible employee under the Falmouth Public Schools' LTD plan is entitled
        to benefits after the end of the elimination period upon submission of proof to
        the Defendant that she is disabled due to sickness and requires the regular
        attendance of a physician.

11.     Plaintiff became totally disabled in March 1998, by reason of residual impairments
        from a fall, including disc disease, diffuse arthralgias, episodic synovitis, and
        fibromyalgia, with symptoms including chronic pain and fatigue.

12.     By reason of such impairments, Plaintiff was determined to be disabled under the
        Cape Cod Hospital LTD Plan, after the six month waiting period, on September 8,
        1998, and she began to receive benefits thereunder.

13.     By notice dated January 19, 2004, the Defendant terminated the Plaintiff's disability
        benefits under the Cape Cod Hospital LTD plan, and on July 14, 2004, Plaintiff
        filed her timely administrative appeal.  (A true copy of said administrative appeal
        is attached hereto as Exhibit B).

14.     On November 2, 2004, the Defendant issued its denial of Plaintiff's appeal,
        upholding its termination of Plaintiff's disability benefits under the Cape Cod
        Hospital LTD Plan.

15.     The Defendant's termination and denial of Plaintiff's LTD claim was arbitrary and
        capricious, was not supported by substantial evidence and was contrary to the
        substantial medical and vocational evidence of record.

## COUNT I:    BREACH OF CONTRACT

16.     By reason of the matters stated in Paragraphs 1 through 15, the Defendant has
        breached its contractual obligations to the Plaintiff under the Cape Cod

Hospital's LTD plan, and they are liable therefore, as provided by 29 U.S.C.

Sect. 1132(a)(1)(B), for all benefits payable to Plaintiff for the period from

September 8,1004, through the present, plus interest, costs and attorneys fees.

## COUNT II:   WRONGFUL CLAIM DENIAL UNDER ERISA

20.   By reason of the matters stated in Paragraphs 1 through 15, the Defendant

has wrongfully and unreasonably terminated LTD benefits under the Cape Cod

Hospital's LTD plan, in violation of ERISA, 29 U.S.C. Sect. 1132(a)(1)(B) and Sect.

1133; and Defendant is liable to Plaintiff therefor for payment of all benefits due from

September 8, 2004, through the present, and for further payment of monthly benefits

through Plaintiff's 65th birthday, plus interest, costs and attorneys fees.

**WHEREFORE, Plaintiff demands judgment and relief as follows:**

**First,** on Counts I and II, that the Court make findings that the Defendant's termination of

Plaintiff's LTD claim was arbitrary and capricious, unreasonable, unsupported by the

substantial evidence of record and/or in breach of Defendant's contractual obligations, with

judgment for monetary damages against the Defendant, Boston Mutual Life Insurance

Company to pay all benefits past due and due in future on Plaintiff's claim, plus interest,

costs of the action and attorneys fees;

**Second,** on Counts I and II and in the alternative, that the Court make findings that the

Defendant's termination of Plaintiff's LTD claim was arbitrary and capricious, unreasonable,

unsupported by the substantial evidence of record and/or in breach of Defendant's

contractual obligations, with an order that the matter be remanded to the Defendant,

Boston Mutual Life Insurance Company, for further review and determination of

4

Plaintiff's claim under the Cape Cod Hospital's LTD plan, with costs of the action

and attorneys fees; and

**Third,** that the Court grant to Plaintiff such other relief as may be available to her on

the facts as pleaded herein.

Dated: `4/1/05`                                For the Plaintiff,

Richard K. Latimer, BBO#287840
Kistin Babitsky Latimer & Beitman
Box 590, 13 Falmouth Heights Rd.
Falmouth, MA  02541
(508) 540-1606

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

1.  **TITLE OF CASE (NAME OF FIRST PARTY ON EACH SIDE ONLY)**_____

    MARILYN BYRNE v. BOSTON MUTUAL LIFE INSURANCE COMPANY_____

2.  **CATEGORY IN WHICH THE CASE BELONGS BASED UPON THE NUMBERED NATURE OF SUIT CODE LISTED ON THE CIVIL COVER SHEET. (SEE LOCAL RULE 40.1(A)(1)).**

    ___ I.    160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

    XX  II.   195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,       *Also complete AO 120 or AO 121
              740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.          for patent, trademark or copyright cases

    ___ III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
              315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
              380, 385, 450, 891.

    ___ IV.   220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
              690, 810, 861-865, 870, 871, 875, 900.

    ___ V.    150, 152, 153.

3.  **TITLE AND NUMBER, IF ANY, OF RELATED CASES. (SEE LOCAL RULE 40.1(E)).**

    _____

4.  **HAS A PRIOR ACTION BETWEEN THE SAME PARTIES AND BASED ON THE SAME CLAIM EVER BEEN FILED IN THIS COURT?**                                                   YES ☐   NO ☒

5.  **DOES THE COMPLAINT IN THIS CASE QUESTION THE CONSTITUTIONALITY OF AN ACT OF CONGRESS AFFECTING THE PUBLIC INTEREST? (SEE 28 USC 2403)**                     YES ☐   NO ☒
    **IF SO, IS THE U.S.A. OR AN OFFICER, AGENT OR EMPLOYEE OF THE U.S. A PARTY?**   YES ☐   NO ☐

6.  **IS THIS CASE REQUIRED TO BE HEARD AND DETERMINED BY A DISTRICT COURT OF THREE JUDGES PURSUANT TO TITLE 28 USC 2284?**                                        YES ☐   NO ☒

7.  **DO ALL PARTIES IN THIS ACTION RESIDE IN THE CENTRAL SECTION OF THE DISTRICT OF MASSACHUSETTS (WORCESTER COUNTY) - (SEE LOCAL RULE 40.1(C)).**               YES X☐   NO ☐
    **OR IN THE WESTERN SECTION (BERKSHIRE, FRANKLIN, HAMPDEN OR HAMPSHIRE COUNTIES)? - (SEE LOCAL RULE 40.1(D)).**                                               YES ☐   NO ☐

8.  **DO ALL OF THE PARTIES RESIDING IN MASSACHUSETTS RESIDE IN THE CENTRAL AND/OR WESTERN SECTIONS OF THE DISTRICT?**                                           YES ☐   NO ☐
    (a)   IF YES, IN WHICH SECTION DOES THE PLAINTIFF RESIDE?_____

9.  **IN WHICH SECTION DO THE ONLY PARTIES RESIDING IN MASSACHUSETTS RESIDE?**   Eastern _____

10. **IF ANY OF THE PARTIES ARE THE UNITED STATES, COMMONWEALTH OF MASSACHUSETTS, OR ANY GOVERNMENTAL AGENCY OF THE U.S.A. OR THE COMMONWEALTH, DO ALL OTHER PARTIES RESIDE IN THE CENTRAL SECTION;** YES ☐  **NO** ☐   **OR WESTERN SECTION;** YES ☐   NO ☐

    (PLEASE TYPE OR PRINT)
    ATTORNEY'S NAME  Richard K. Latimer/Kistin Babtisky Latimer & Beitman
    ADDRESS  Box 590, 13 Falmouth Heights Road, Falmouth, MA  02541
    TELEPHONE NO.  (508) 540-1606

    (Categform.rev - 3/97)

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

MARILYN BYRNE

## DEFENDANTS

BOSTON MUTUAL LIFE INSURANCE COMPANY

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Richard K. Latimer/Kistin Babitsky
Latimer & Beitman, Box 590, 13 Falmouth
Heights Road, Falmouth, MA  02541-0590
(508) 540-1606

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government
Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government
Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties
in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF
(For Diversity Cases Only) AND ONE BOX FOR DEFENDANT)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
another district
(specify)

☐ 6 Multidistrict
Litigation

☐ 7 Appeal to District
Judge from
Magistrate
Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 630 Liquor Laws | | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 650 Airline Regs. | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 690 Other | ☐ 840 Trademark | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | | **LABOR** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 861 HIA (1395ff) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **PERSONAL INJURY** | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 893 Environmental Matters |
| | ☐ 362 Personal Injury — Med. Malpractice | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 894 Energy Allocation Act |
| | ☐ 365 Personal Injury — Product Liability | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 895 Freedom of Information Act |
| | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| **PERSONAL PROPERTY** | | | **FEDERAL TAX SUITS** | ☐ 950 Constitutionality of State Statutes |
| ☐ 370 Other Fraud | | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 890 Other Statutory Actions |
| ☐ 371 Truth in Lending | | | ☐ 871 IRS — Third Party 26 USC 7609 | |
| ☐ 380 Other Personal Property Damage | | | | |
| ☐ 385 Property Damage Product Liability | | | | |

| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** |
|---|---|---|
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence |
| ☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 530 General |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights |
| | | ☐ 555 Prison Condition |

Note: In V. NATURE OF SUIT, box ☒ 791 Empl. Ret. Inc. Security Act is marked.

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE.
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

29 U.S.C. Sect. 1001, et seq., ERISA
Wrongful denial of disability claim

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ YES  ☒ NO

## VIII. RELATED CASE(S) (See instructions):
IF ANY

JUDGE _____

DOCKET NUMBER _____

DATE
4/1/05

SIGNATURE OF ATTORNEY OF RECORD
_____

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

# BOSTON MUTUAL LIFE INSURANCE COMPANY

120 Royall Street                                           Canton, Massachusetts 02021

## POLICY FACE PAGE

POLICY NO.   G-50187

EFFECTIVE DATE: April 1, 1994
(Due date of first premium)

POLICYHOLDER:   Cape Cod Hospital

POLICY DELIVERED IN    the Commonwealth of Massachusetts    and subject to the laws of that jurisdiction.

PREMIUMS are due and payable    monthly    on    1st    day of each month.

POLICY ANNIVERSARIES shall be annually beginning on    April 1, 1995.

$0.50 per $100.*
INITIAL MONTHLY PREMIUM: $0.43 per $100.** of total covered payroll per month.
* Division 001   ** Divisions 002, 003, 004.

The Boston Mutual Life Insurance Company (the Insurance Company) agrees to pay the benefits provided by the Policy in accordance with its provisions.

The Policy is issued in consideration of the Application of the Policyholder, a copy of which is attached, and of the payment of premiums by the Policyholder.

The following pages including any riders, endorsements or amendments are a part of this policy.

Signed for the Insurance Company at Canton, Massachusetts on the effective date.

Licensed Resident Agent

NON-PARTICIPATING
GROUP LONG TERM DISABILITY INSURANCE POLICY

Secretary                                                    President

PDP-LTD-85-3.0 ED. 11-88

# POLICY INDEX

SECTION I           APPLICATION

SECTION II          DEFINITIONS

SECTION III         ELIGIBILITY AND EFFECTIVE DATES

SECTION IV          BENEFITS

SECTION V           TERMINATION PROVISIONS

SECTION VI          GENERAL POLICY PROVISIONS

SECTION VII         PREMIUMS

PDP-LTD-85-4.0 ED. 11-88

# SECTION II — DEFINITIONS

For the purpose of this policy:

ACTIVE EMPLOYMENT means you must be working:
1. for your employer on a full-time active basis and paid regular earnings;
2. at least the minimum number of hours shown in the plan outline; and either:
   a. at your employer's usual place of business; or
   b. at a location to which your employer's business requires you to travel.
3. You will be considered to be actively at work if you were actually at work on the day immediately preceding:
   a. a weekend (except for one or both of these days if they are scheduled days of work);
   b. holidays (except when such holiday is a scheduled work day);
   c. paid vacations;
   d. any non-scheduled work day;
   e. excused leave of absence (except medical leave and lay-off); and
   f. emergency leave of absence (except emergency medical leave).

ANNUAL SALARY means your earnings in effect for the twelve month period immediately prior to the date disability begins. Annual salary includes all earnings before any reductions. It does not include bonuses, overtime pay, and extra compensation other than commissions. Commissions will be averaged over the 12 month period prior to the date disability begins.

APPLICATION is the document showing the eligible classes, the amounts of insurance and other relevant information pertaining to the plan of insurance applied for by the policyholder. This document, designated Section I, is attached to and is part of this policy.

BASIC MONTHLY EARNINGS or PRE-DISABILITY EARNINGS means your monthly rate of earnings from your employer in effect immediately prior to the date disability begins. Basic monthly earnings include all earnings before any reductions. It does not include bonuses, overtime pay and extra compensation other than commissions. Commissions will be averaged over the 12 month period before the date your disability began.

CERTIFICATE means a written statement prepared by the Company including all amendments, riders and supplements, if any, setting forth a summary of:

1. the insurance benefits to which an employee is entitled;
2. to whom the benefits are payable; and
3. limitations or requirements that may apply.

COMPANY means Boston Mutual Life Insurance Company, 120 Royall Street, Canton, Massachusetts.

Definitions
w/o "total"

## SECTION II — DEFINITIONS
### (Continued)

DISABILITY BENEFIT when used with the term retirement plan, means money which:

1.  is payable under a retirement plan due to a disability as defined in the plan; and

2.  does not reduce the amount of money which would have been paid as retirement benefits at the normal retirement age under the plan if the disability had not occurred. (If the payment does not cause such a reduction, it will be deemed a retirement benefit as defined in this policy.)

ELIGIBILITY DATE means the date that an employee becomes eligible for insurance under this policy. Classes are shown in the application.

ELIMINATION PERIOD means a period of consecutive days of disability for which no benefit is payable. The elimination period is shown in the application and begins on the first day of disability.

NOTE: If the insured returns to work for any 14 or less days during the elimination period and cannot continue, we will count only those days the insured is disabled to satisfy the elimination period.

EMPLOYEE means a person in full-time active employment with the employer.

EMPLOYER means the policyholder and includes any division, subsidiary or affiliated company named in the application.

EVIDENCE OF INSURABILITY means a statement or proof of an employee's medical history upon which acceptance for insurance will be determined by the Company.

GRACE PERIOD is the 31 days following a premium due date during which premium payment may be made. During the grace period the policy shall continue in force unless the policyholder has given the insurer written notice of discontinuance of the policy.

GROSS MONTHLY BENEFIT means the insured employee's monthly benefit before any reduction for other income benefits and earnings.

Definitions
(Continued)
w/o ''total''
(elim. period over 90 days)

## SECTION II — DEFINITIONS
## (Continued)

<u>HOME OFFICE</u> means Boston Mutual Life Insurance Company, 120 Royall Street, Canton, Massachusetts.

<u>INDEXED PRE-DISABILITY EARNINGS</u> means the insured's basic monthly earnings in effect just prior to the date disability began adjusted on the first anniversary of benefit payments and each anniversary thereafter.

<u>SICKNESS</u> means illness, disease, pregnancy or complications of pregnancy. The sickness must begin while the employee is insured under this policy.

<u>INJURY</u> means bodily injury resulting directly from an accident and independently of all other causes. The injury must occur and disability must begin while the employee is insured under this policy.

Exception: Any disability which begins more than 60 days after an injury will be considered a sickness for the purpose of determining benefits under this policy.

<u>INSURED</u> means an employee insured under this policy.

<u>MALE PRONOUN</u> whenever used includes the female.

<u>MONTHLY BENEFIT</u> means the amount payable by the Company to the disabled insured.

<u>OWN OCCUPATION</u> - See definition of Total Disability or Totally Disabled.

<u>PHYSICIAN</u> means a person who:

1. is licensed to practice medicine and prescribe and administer drugs or to perform surgery; or
2. is legally qualified as a medical practitioner and required to be recognized under this policy for insurance purposes according to the insurance statutes/regulations of the governing jurisdiction; and
3. is not an employee or his spouse, daughter, son, father, mother, sister or brother.

<u>PRE-DISABILITY EARNINGS</u> - See definition of Basic Monthly Earnings.

<u>RETIREMENT BENEFIT</u> when used with the term retirement plan, means money which:

1. is payable under a retirement plan either in a lump sum or in the form of periodic payments;

2. does not represent contributions made by an employee (payments which represent employee contributions are deemed to be received over the employee's expected remaining life regardless of when such payments are actually received); and

3. is payable upon:

    a. early or normal retirement; or
    b. disability if the payment does reduce the amount of money which would have been paid at the normal retirement age under the plan if the disability had not occurred.

PDP-LTD-85-7.0 ED. 11-88

## SECTION II — DEFINITIONS
### (Continued)

RETIREMENT PLAN means a plan which provides retirement benefits to employees and which is not funded wholly by employee contributions. The term shall not include: a 401(k), profit-sharing plan, thrift plan, informal salary continuation plan, individual retirement account (IRA), tax sheltered annuity (TSA), stock ownership plan, or a non-qualified plan of deferred compensation.

EMPLOYER'S RETIREMENT PLAN is deemed to include any retirement plan:

1.  which is part of any federal, state, county, municipal or association retirement system; or

2.  for which the employee is eligible as a result of employment with the employer.

TIME EFFECTIVE means an effective date will start at 12:01 A.M. A termination date will end at 12:00 midnight. Each of these times is Standard Time in the place where this policy is delivered. Insurance under this policy will start and end at these times.

TOTAL COVERED PAYROLL is the total amount of basic monthly earnings for which all employees are insured under this policy.

WAITING PERIOD as shown in the application means the continuous length of time an employee must serve in an eligible class to reach his eligibility date.

# SECTION II — DEFINITIONS
## (Continued)

All full-time active employees who are Attorneys, Physicians, Engineers, Architects, CPA's and officers, administrators, executives, managers, or other professional employees, whose annual salary is $30,000 or more per year are eligible for a 60 Month Own Occupation Benefit. (See A below under Total Disability or Totally Disabled.)

All other full-time active employees are eligible for a 36 Month Own Occupation Benefit. (See B below under Total Disability or Totally Disabled.)

A.    TOTAL DISABILITY or TOTALLY DISABLED means during the elimination period and the next 60 months of disability the insured is:

   1.    unable to perform all of the material and substantial duties of his occupation on a full-time basis because of a disability:
         a. caused by injury or sickness;
         b. that started while insured under this policy; and

   2.    after 60 months of benefits have been paid, the insured is unable to perform with reasonable continuity all of the material and substantial duties of his own or any other occupation for which he is or becomes reasonably fitted by training, education, experience, age and physical and mental capacity.

B.    TOTAL DISABILITY or TOTALLY DISABLED means during the elimination period and the next 36 months of disability the insured is:

   1.    unable to perform all of the material and substantial duties of his occupation on a full-time basis because of a disability:
         a. caused by injury or sickness;
         b. that started while insured under this policy; and

   2.    after 36 months of benefits have been paid, the insured is unable to perform with reasonable continuity all of the material and substantial duties of his own or any other occupation for which he is or becomes reasonably fitted by training, education, experience, age and physical and mental capacity.

## SECTION II — DEFINITIONS
### (Continued)

With respect to insureds employed as pilots, co-pilots and crew of aircraft:

"Total disability" or "totally disabled" means because of injury or sickness the insured cannot perform the material duties of any gainful occupation for which he is or becomes reasonably fitted by training, education or experience. The loss of a pilot's license for any reason does not, in itself, constitute total disability.

Total Disability
For Pilots

# SECTION III — ELIGIBILITY AND EFFECTIVE DATES

A.    <u>ELIGIBLE CLASSES</u>

The classes eligible for insurance are shown in the application.

B.    <u>ELIGIBILITY DATE</u>

An employee in an eligible class will qualify for insurance on the later of:

1. the policy effective date; or

2. the day after the employee completes the waiting period.

Eligibility and
Effective Dates

# SECTION III — ELIGIBILITY AND EFFECTIVE DATES
## (Continued)

C.   EFFECTIVE DATES OF INSURANCE

    1.    Insurance will be effective at 12:01 A.M. on the day determined as follows, but only if the employee's written application for insurance is:

        a. made with the Company through his employer; and

        b. on a form satisfactory to the Company.

    2.    An employee will be insured for noncontributory insurance on his eligibility date.

    3.    An employee will be insured for contributory insurance on the latest of these dates:

        a.  the employee's eligibility date if he makes written application for insurance on or before the 31st day after his eligibility date.

        b. the date the Company gives its approval, if the employee:

            i. makes written application for insurance more than 31 days after his eligibility date; or

            ii. terminated his insurance while continuing to be eligible.

    In the case of i. and ii. above, the employee must submit an application and evidence of insurability to the Company for approval. This will be at the employee's expense.

    4.    Delayed Effective Date for Insurance - The effective date of any initial, increased or additional insurance will be delayed for an employee if he is not in active employment because of a disability. The initial, increase or additional insurance will start on the date that the employee returns to full-time active employment.

    5.    If an insured employee enters another eligible class, he will not be eligible for any additional benefits until he has completed a 30-day waiting period, and has been actively at work one full day in the new class.

Combination Contributory
and Noncontributory

# SECTION IV — BENEFITS

<u>PARTIAL DISABILITY</u> or <u>PARTIALLY DISABLED</u> means as a result of the sickness or injury which caused total disability, the insured is:

1.  able to perform one or more, but not all, of the material and substantial duties of his own or any other occupation on a full-time or a part-time basis; or

2.  able to perform all of the material and substantial duties of his own or any other occupation on a part-time basis.

To qualify for a partial disability benefit the insured must be earning less than 80% of his pre-disability earnings at the time partial disability employment begins.

<u>PARTIAL DISABILITY</u>

When proof is received that you are partially disabled from a sickness or injury following a period of total disability for which benefits were payable, the Company will pay a partial disability benefit if the insured:

1.  is partially disabled within 31 days of the date his total disability benefits cease; and

2.  gives to the Company upon request, and at the insured's expense, proof of continued:

    a. partial disability; and

    b. regular attendance of a physician.

<u>PARTIAL DISABILITY MONTHLY BENEFIT</u>

To figure the amount of monthly benefit:

1.  Multiply your pre-disability earnings by the benefit percentage shown in the application.

2.  Take the lesser of:

    a. the amount determined in step (1) above; or
    b. 100% of the insured's pre-disability earnings less other income benefits, shown below; or
    c. the maximum monthly benefit shown in the application.

The partial disability benefit will never be less than the minimum monthly benefit shown in the application.

## SECTION IV — BENEFITS
## (Continued)

PROOF OF DISABILITY

When the Company receives proof that an insured is disabled due to sickness or injury and requires the regular attendance of a physician, the Company will pay the insured a monthly benefit after the end of the elimination period. The benefit will be paid for the period of disability if the insured gives to the Company proof of continued:

    1. disability; and
    2. regular attendance of a physician.

The proof must be given upon request and at the insured's expense.

The monthly benefit will not:

    1. exceed the insured's amount of insurance; or
    2. be paid for longer than the maximum benefit period.

The amount of insurance and the maximum benefit period are shown in the application.

PDP-LTD-85-12.2 ED. 11-88

## SECTION IV — BENEFITS
## (Continued)

<u>MONTHLY BENEFIT</u>

To figure the amount of monthly benefit:

1.  Multiply the insured's basic monthly earnings by the benefit percentage shown in the application.

2.  Take the lesser of:

    a. the amount figured in step (1) above; or
    b. the maximum monthly benefit shown in the application; and then

3.  Deduct other income benefits, shown on the next page from this amount.

This is the total disability benefit which the insured may receive.

PDP-LTD-85-13.1 ED. 11-88

Standard Integration

# SECTION IV — BENEFITS
## (Continued)

OTHER INCOME BENEFITS

Other income benefits mean those benefits shown below:

1.  The amount for which the insured is eligible under:

    a. Workers' or Workmen's Compensation Law;
    b. occupational disease law; or
    c. any other act or law of like intent.

2.  The amount of any disability income benefits for which the insured is eligible to receive under any compulsory benefit act or law.

3.  The amount of any disability income benefits for which the insured is eligible to receive under:

    a. any other group insurance plan of the employer; or
    b. any governmental retirement system as a result of his job with the employer.

4.  The amount of benefits the insured receives under the employer's retirement plan as follows:

    a. any disability benefits; or
    b. any retirement benefits.

5.  The amount of disability or retirement benefits under the United States Social Security Act, The Canada Pension Plan, The Quebec Pension Plan, or any similar plan or act, as follows:

    a. disability or unreduced retirement benefits for which:

    i.   the insured is eligible; and
    ii.  his spouse, child or children are eligible because of his disability; or
    iii. his spouse, child or children are eligible because of his eligibility for unreduced retirement benefits; or

    b. reduced retirement benefits received by:

    i.   the insured; and
    ii.  his spouse, child or children because of his receipt of the reduced retirement benefits.

6.  The amount of earnings the insured receives from any sick leave or formal salary continuation plan paid by the employer.

7.  The amount of earnings the insured earns or receives from any form of employment.

These other income benefits, except retirement benefits, must be payable as a result of the same disability for which we pay a benefit.

## SECTION IV — BENEFITS
### (Continued)

COST OF LIVING FREEZE

After the first deduction for each of the other income benefits, the monthly benefit will not be further reduced due to any cost of living increases payable under these other income benefits. This provision does not apply to increases received from any form of employment.

LUMP SUM PAYMENTS

Other income benefits which are paid in a lump sum will be prorated on a monthly basis over the time period for which the sum is given. If no time period is stated, the sum will be prorated on a monthly basis over the expected lifetime of the insured. In each case, the amount to be prorated will be calculated by an actuary, based on a morbidity table, with interest, or a mortality table, with interest, depending on the source of the lump sum.

TERMINATION OF DISABILITY BENEFIT

The monthly benefit will cease on the earliest of:

1. the date the insured is no longer disabled; or

2. the date the insured dies; or

3. the end of the maximum benefit period; or

4. the date the insured's current earnings exceed 85% of his pre-disability earnings.

NOTE:  Because the insured's current earnings may fluctuate, the insurance company may average earnings over three (3) consecutive months rather than immediately terminating his/her benefit once 85% of your pre-disability income has been reached.

BENEFIT PERIOD EXTENSION

The maximum benefit period is shown in the Application. However, benefits will be extended beyond the end of the maximum benefit period if a totally disabled employee attains the age specified in the benefit duration schedule and has not received twelve monthly benefit payments. In this event, the benefit period will be extended during the continuance of total disability until twelve monthly payments have been paid.

Termination Provision
(w/o indexed)

## SECTION IV — BENEFITS
## (Continued)

RECURRENT DISABILITY means a disability which is related or due to the same cause(s) as a prior disability for which a monthly benefit was received.

A recurrent disability will be treated as a part of the prior disability if, after receiving disability benefits under this policy, an insured:

> 1. returns to his regular occupation on a full-time basis for less than six months; and
>
> 2. performs all the material duties of his occupation.

To qualify for a recurrent disability benefit, the insured must experience more than a 20% loss of pre-disability earnings.

Benefit payments will be subject to the terms of this policy for the prior disability.

If an insured returns to his regular occupation on a full-time basis for six months or more, a recurrent disability will be treated as a new period of disability. The insured must complete another elimination period.

If an insured becomes eligible for coverage under any other group long term disability policy, this recurrent disability section will cease to apply to that insured.

Recurrent Disability

# SECTION IV — BENEFITS
## (Continued)

<u>THREE MONTH SURVIVOR BENEFIT</u>

The Company will pay a lump sum benefit to the eligible survivor when proof is received that an insured died:

    1. after disability had continued for 180 or more consecutive days; and

    2. while receiving a monthly benefit.

The lump sum benefit will be an amount equal to three times the insured's last monthly benefit.

<u>ELIGIBLE SURVIVOR</u> means the insured's spouse, if living, otherwise the insured's children under age 25.

If payment becomes due to the insured's children, payment will be made to:

    1. the children; or

    2. a person named by the Company to receive payments on the children's behalf. This payment will be valid and effective against all claims by others representing or claiming to represent the children.

<u>LAST MONTHLY BENEFIT</u> means the monthly benefit paid to the insured immediately prior to his death but not including any reduction for earnings received from employment.

# SECTION IV — BENEFITS
## (Continued)

MENTAL ILLNESS LIMITATION

Benefits for disability due to mental illness will not exceed 24 months of monthly benefit payments unless the insured meets one of these situations:

1.  The insured is in a hospital or institution at the end of the 24 month period. The monthly benefit will be paid during the confinement.

    If the insured is still disabled when discharged, the monthly benefit will be paid for a recovery period up to 90 days.

    If the insured becomes reconfined during the recovery period for at least 14 days in a row, benefits will be paid for the confinement and another recovery period up to 90 more days.

2.  The insured continues to be disabled and becomes confined:

    a. after the 24 month period; and

    b. for at least 14 days in a row.

    The monthly benefit will be payable during the confinement.

    The monthly benefit will not be payable beyond the maximum benefit period.

HOSPITAL or INSTITUTION means a facility licensed to provide care and treatment for the condition causing the insured's disability.

MENTAL ILLNESS means mental, nervous or emotional diseases or disorders of any type.

## SECTION IV — BENEFITS
## (Continued)

PROGRESSIVE PARTIAL DISABILITY BENEFIT

The Company will pay a Progressive Partial Disability Benefit for a disability which is caused by an injury or sickness once an insured has met his Elimination Period. The Elimination Period can be a combination of total and partial disability, or all total, or all partial disability. The insured does not have to be totally disabled prior to receiving a Progressive Partial Disability Benefit.

To receive a Progressive Partial Disability Benefit, the insured must meet his elimination period and is either:

1.  able to perform one or more, but not all, of the material and substantial duties of his own or any other occupation on a full-time or a part-time basis; or

2.  able to perform all of the material and substantial duties of his own or any other occupation on a part-time basis.

To qualify for a Progressive Partial Disability Benefit the insured must be earning less than 80% of his pre-disability earnings at the time partial disability employment begins.

PROGRESSIVE PARTIAL DISABILITY MONTHLY BENEFIT

To figure the amount of monthly benefit:

1.  Multiply the Insured's earnings by the benefit percentage shown in the application.

2.  Take the lesser of:

    a. the amount determined in step (1) above; or
    b. 100% of the insured's pre-disability earnings less other income benefits; or
    c. the maximum monthly benefit shown in the application.

The Progressive Partial Disability benefit will never be less than the minimum monthly benefit shown in the application.

## SECTION IV — BENEFITS
### (Continued)

PRE-EXISTING CONDITION EXCLUSION

This policy will not cover any disability:

      1. caused or contributed to by a pre-existing condition; or

      2. resulting from a pre-existing condition.

But, this Policy will cover that disability once the insured has performed the material duties of his occupation:

      1. on a full-time basis;

      2. for at least five consecutive days after the insured's effective date.

TREATMENT means consultation, care or services provided by a physician including diagnostic measures and taking prescribed drugs and medicines.

PRE-EXISTING CONDITION means a diagnosed sickness or injury for which the insured received treatment within 30 days prior to the insured's effective date.

Five Day Actively-at-Work
Exclusion

# SECTION IV — BENEFITS
## (Continued)

<u>PRE-EXISTING CONDITION EXCLUSION</u>

This policy will not cover any disability:

    1. which is caused or contributed to by, or results from a pre-existing condition; and

    2. which begins in the first 12 months after the insured's effective date, unless he has had no treatment of the condition for 6 consecutive months after his effective date.

<u>TREATMENT</u> means consultation, care or services provided by a physician including diagnostic measures and taking prescribed drugs and medicines.

<u>PRE-EXISTING CONDITION</u> means a diagnosed sickness or injury for which the insured received treatment within 3 months prior to the insured's effective date.

# SECTION IV — BENEFITS
## (Continued)

CONTINUITY OF COVERAGE UPON TRANSFER OF INSURANCE CARRIERS

In order to prevent loss of coverage for an employee because of a transfer of insurance carriers, this policy will provide coverage for certain employees as follows:

FAILURE TO BE IN ACTIVE EMPLOYMENT DUE TO INJURY OR SICKNESS

This policy will cover, subject to premium payments, employees:

1. insured with the prior carrier at the time of transfer; and

2. who are not in active employment due to injury or sickness.

The benefit payable will be that which would have been paid by the prior carrier had coverage remained in force, less any benefit for which the prior carrier is liable.

DISABILITY DUE TO A PRE-EXISTING CONDITION

Benefits may be payable for a disability due to a pre-existing condition for an employee who:

1. was insured by the prior carrier at the time of transfer; and

2. was in active employment and insured under this policy on its effective date.

The benefits will be determined as follows:

1. The Company will apply this policy's pre-existing condition exclusion. If the employee qualifies for benefits, he will be paid according to this policy's benefit schedule.

2. If the employee cannot satisfy this policy's pre-existing condition exclusion, the prior carrier's pre-existing condition exclusion will be applied.

    a. If the employee satisfies the prior carrier's pre-existing condition exclusion, giving consideration towards continuous time insured under both policies, he will be paid according to the prior carrier's benefit schedule.

    b. If he cannot satisfy the pre-existing condition exclusion of this plan or that of the prior carrier, no benefit will be paid.

# SECTION V — TERMINATION PROVISIONS

A.    TERMINATION OF EMPLOYEE'S INSURANCE

An employee will cease to be insured at 12:00 midnight on the earliest of the following dates:

1. the date this policy terminates but without prejudice to any claim originating prior to the time of termination;

2. the date the employee is no longer in an eligible class;

3. the date the employee's class is no longer included for insurance;

4. the last day for which any required employee contribution has been made;

5. the date employment terminates. Cessation of active employment will be deemed termination of employment, except:

    a. the insurance will be continued for an employee absent due to total disability during:

        i. the elimination period; and

        ii. the period during which premium is being waived.

    b. the employer may continue the employee's insurance by paying the required premium, subject to the following:

        i.   Insurance may be continued for an employee:

            (a.) temporarily laid off; or

            (b.) given leave of absence;

            (c.) but not beyond the end of the month after the lay-off or leave of absence begins.

        ii.  the employer must act so as not to discriminate unfairly among employees in similar situations.

The Insurer reserves the right to review and terminate all classes insured under this Policy if any class(es) cease(s) to be covered.

SECTION V - TERMINATION PROVISIONS
(CONTINUED)

B.  **TERMINATION OF POLICY**

1.  Termination of this policy under any conditions will not prejudice any claim which occurs while this policy is in force.

2.  If the policyholder fails to pay any premium within the grace period, this policy will terminate at 12:00 midnight of the last day of the grace period. The policyholder may terminate this policy by advance written notice delivered to the Company at least 31 days prior to the termination date. But, this policy will not terminate during any period for which premium has been paid. The policyholder will be liable to the Company for all premiums due and unpaid for the full period for which this policy is in force.

3.  The Company may terminate this policy on any premium due date by giving written notice to the policyholder at least 31 days in advance if:

    a.  the number of employees insured is less than 10; or

    b.  less than 100% of the employees eligible for any noncontributory insurance are insured for it; or

    c.  less than 75% of the employees eligible for any contributory insurance are insured for it; or

    d.  the policyholder fails:

        i.   to furnish promptly any information which the Company may reasonably require; or

        ii.  to perform any other obligations pertaining to this policy.

4.  Termination may take effect on an earlier date when both the policyholder and the Company agree.

# SECTION VI — GENERAL POLICY PROVISIONS

A.  <u>STATEMENTS</u>

In the absence of fraud, all statements made in any signed application are considered representations and not warranties (absolute guarantees).
No representations by:

1.  the policyholder in applying for this policy will make it void unless the representation is contained in the signed application; or

2.  any employee in applying for insurance under this policy will be used to reduce or deny a claim unless a copy of the application for insurance, signed by the employee, is or has been given to the employee.

B.  <u>COMPLETE CONTRACT - POLICY CHANGES</u>

1.  This policy is the complete contract. It consists of:

    a. all of the pages;

    b. the attached signed application of the policyholder;

    c. each employee's signed application for insurance (employee retains his own copy).

2.  This policy may be changed in whole or in part. Only an officer or a registrar of the Company can approve a change. The approval must be in writing and endorsed on or attached to this policy.

3.  Any other person, including an agent, may not change this policy or waive any part of it.

C.  <u>EMPLOYEE'S CERTIFICATE</u>

The Company will provide a certificate to the policyholder for delivery to each insured. It will state the benefits to which the insured is entitled and to whom these benefits are payable. If the terms of a certificate and this policy differ, this policy will govern.

## SECTION VI — GENERAL POLICY PROVISIONS
### (Continued)

D.    FURNISHING OF INFORMATION — ACCESS TO RECORDS

    1.    the employer will furnish at regular intervals to the Company:

        a. information relative to employees:

            i. who qualify to become insured;
            ii. whose amounts of insurance change; and/or
            iii. whose insurance terminates.

        b. any other information about this policy that may be reasonably required.

    The employer's records which, in the opinion of the Company, have a bearing on the insurance will be opened for inspection at any reasonable time.

    2.    Clerical error or omission will not:

        a. deprive an employee of insurance;
        b. affect an employee's amount of insurance; or
        c. effect or continue an employee's insurance which otherwise would not be in force.

E.    MISSTATEMENT OF AGE

If an employee's age has been misstated, an equitable adjustment will be made in the premium. If the amount of the benefit is dependent upon an employee's age, as shown in the Benefit Duration Schedule, the amount of the benefit will be the amount an employee would have been entitled to if his or her correct age were known.

Note:  A refund of premium will not be made for a period more than twelve months before the date the Company is advised of the error.

F.    NOTICE AND PROOF OF CLAIM

    1. Notice

      a. Written notice of claim must be given to the Company within 30 days of the date disability starts, if that is possible. If that is not possible, the Company must be notified as soon as it is reasonably possible to do so.

## SECTION VI — GENERAL POLICY PROVISIONS
### (Continued)

     b.   When the Company has the written notice of claim, the Company will send the insured its claim forms. If the forms are not received within 15 days after written notice of claim is sent, the insured can send the Company written proof of claim without waiting for the form.

2.    Proof

     a.   Proof of claim must be given to the Company. This must be done no later than 90 days after the end of the elimination period.

     b.   Failure to furnish such proof within such time shall not invalidate nor reduce any claim if it was not reasonably possible to furnish such proof within such time. Such proof must be furnished as soon as reasonably possible, and in no event, except in the absence of legal capacity of the claimant, later than one year from the time proof is otherwise required.

     c.   Proof of continued disability and regular attendance of a physician must be given to the Company within 30 days of the request for the proof.

     d.   The proof must cover:

          i. the date disability started;

          ii. the cause of disability; and

          iii. the degree of disability.

G.    <u>EXAMINATION</u>

The Company, at its own expense, will have the right and opportunity to have an employee, whose injury or sickness is the basis of a claim, examined by a physician or vocational expert of its choice. This right may be used as often as reasonably required.

H.    <u>LEGAL PROCEEDINGS</u>

A claimant or the claimant's authorized representative cannot start any legal action:

1. until 60 days after proof of claim has been given; or

2. more than 3 years after the time proof of claim is required.

I.    <u>TIME OF PAYMENT OF CLAIMS</u>

When the Company receives satisfactory proof of claim, benefits payable under this policy will be paid monthly during any period for which the Company is liable. Any balance remaining unpaid upon the termination of the period of liability will be paid immediately upon receipt of due written proof.

## SECTION VI — GENERAL POLICY PROVISIONS
### (Continued)

J.   PAYMENT OF CLAIMS

All benefits are payable to the employee. But if a benefit is payable to an employee's estate, an employee who is a minor, or an employee who is not competent, the Company has the right to pay up to $1,000 to any of the employee's relatives whom the Company considers entitled. If the Company pays benefits in good faith to a relative, the Company will not have to pay such benefits again.

The monthly benefits for this policy will be paid on a prorata basis. The rate will be 1/30 per day for any period of disability that does not extend through a full month.

K.   RIGHT OF RECOVERY

If LTD benefits have been over paid on any claim, it will be required that reimbursement be made to Boston Mutual Life Insurance Company within 60 days, or Boston Mutual Life Insurance Company has the right to reduce future benefits until such reimbursement is received. Boston Mutual Life Insurance Company also has the right to recover such overpayments from the insured's estate.

L.   WORKERS' or WORKMEN'S COMPENSATION

This policy is not in lieu of, and does not affect, any requirement for coverage by Workers' or Workmen's Compensation Insurance.

M.   AGENCY

For all purposes of this policy, the policyholder acts on its own behalf or as agent of the employee. Under no circumstances will the policyholder be deemed the agent of the Company without a written authorization.

N.   CONFORMITY WITH LOCAL STATUTES

Any provision of this policy which, on its Effective Date, is in conflict with the statutes of the jurisdiction in which this policy was delivered is hereby amended to conform to the minimum requirements of such statute.

O.   INCONTESTABILITY

The validity of the policy shall not be contested, except for non-payment of premiums, after it has been in force for two years from the date of issue. The validity of the policy shall not be contested on the basis of a statement made relating to insurability by any person covered under the policy after such insurance has been in force for two years during such person's lifetime, and shall not be contested unless the statement is contained in a written instrument signed by the person making such statement.

# SECTION VII — PREMIUMS

A.    <u>PREMIUM RATES</u>

The initial premium is determined on the basis of the rates shown on the policy face page.

The Company may establish new rates for all future premiums as well as the one then due:

1.    when the terms of this policy are changed;

2.    when a division, subsidiary, or affiliated company is added to this policy; or

3.    when the number of Insured Persons changes by 25% or more from the number insured on the Policy Effective Date; or

4.    for reasons other than 1., 2., or 3. above, such as, but not limited to a change in factors bearing on the risk assumed. But, the rates may not be changed within the first 12 months following the policy effective date.

No premium may be increased unless the Company notifies the employer at least 31 days in advance. Premium increases may take effect on the earlier date when both the Company and the employer agree.

B.    <u>PAYMENT OF PREMIUMS</u>

1.    Premium payment calculations will be based on the coverage provided under this policy. Both are determined by the definition of basic monthly earnings.

2.    All premiums due under this policy, including adjustments, if any, are payable by the employer on or before their due dates at the Company's home office. The due dates are specified on the first page of this policy.

3.    Premiums payable to the Company will be paid in United States dollars.

4.    If premiums are payable on a monthly basis, premiums for additional or increased insurance becoming effective during a policy month will be charged from the next premium due date.

5.    The premium charge for insurance terminated during a policy month will cease at the end of the policy month in which such insurance terminates. This manner of charging premium is for accounting purposes only. It will not extend insurance coverage beyond a date it would have otherwise terminated as shown in the "Termination of Employee's Insurance" section of this policy.

## SECTION VII — PREMIUMS
### (Continued)

6.  If premiums are payable on other than a monthly basis, premiums for additional, increased, reduced or terminated insurance will cause a prorata adjustment on the next due date.

7.  Except for fraud and premium adjustments, refunds or charges will be made only for:

    a. the current policy year; and

    b. the prior policy year.

C.  <u>WAIVER OF PREMIUM</u>

Premium payments are waived during any period for which benefits are payable. If coverage is to be continued, premium payments may be resumed following a period during which they were waived.

EXHIBIT B

ATTORNEYS
Ronald S. Beitman
Richard Latimer

OF COUNSEL
Steven Babitsky



*KISTIN, BABITSKY,*
*LATIMER & BEITMAN*

*Attorneys at Law*

FALMOUTH OFFICE
13 Falmouth Heights Road
P.O. Box 590
Falmouth, MA 02541-0590
Telephone (508) 540-1606
Fax (508) 540-5870

July 14, 2004

Susan W. Colinet
Senior Appeals Specialist
Integrated Disability Resources, Inc.
PO Box 9461
Portland, ME 04104

VIA UPS NEXT DAY DELIVERY

Re.   Marilyn Byrne
      Claim #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
      **Appeal for Long Term Disability Benefits**

Dear Ms. Colinet:

Appeal is made from the termination of long term disability benefits on the above claim by notice of January 18, 2004.   This memorandum of appeal, together with evidentiary documents enclosed herewith, are submitted for review within the 180-day appeal period specified in the letter of termination.   I ask that this letter and the enclosed documents be therefore included in the claim file on this matter, to be produced as an integral part of the record for review in the event that an ERISA appeal is taken to federal court.

## A.   Submission of Evidentiary Documents

Evidentiary documents submitted with this memorandum of appeal include the sworn affidavit of Marilyn Byrne, relevant medical records, documents relevant to the medications taken by Ms. Byrne and relevant vocational materials from O*Net and the Dictionary of Occupational Titles.

### 1.   Affidavit of Marilyn Byrne

Enclosed is the five-page affidavit of Marilyn Byrne dated July 12, 2004, made on pain and penalty of perjury, which describes in detail her daily activities, her medications and their effects and the functional restrictions imposed by her disabling medical conditions. The affidavit is a sworn statement of factual matters relevant to the claim and it is therefore substantial evidence for purposes of this appeal.   This affidavit is submitted for inclusion in the claim file to be made part of the record on any further appeal.

2.    **Medical Records**

Medical records from Ms. Byrne's treating and examining physicians are enclosed as follows:

| | | |
|---|---|---|
| <u>Cape Cod Hospital</u><br>3/11/98-5/14/03 | Outpatient Records, Radiology Reports | 17 pages |
| <u>John Berry, MD</u><br>3/16/98-1/27/04 | Office Notes, Attending Physician Statements | 13 pages |
| <u>Robert Monighetti, MD</u><br>5/14/98-7/2/98 | Narrative Reports | 4 pages |
| <u>Neurological Associates</u><br>5/19/98-8/30/99 | Dr. Johnson & Dr. McCarthy Narrative Reports | 9 pages |
| <u>Ann Trout, MD</u><br>6/17/98-1/17/99 | Narrative Reports | 13 pages |
| <u>Robert Leaver, MD</u><br>8/3/99 | Narrative Report | 1 page |
| <u>Paul C. Lee, MD</u><br>9/1/99 | IME Report | 4 pages |
| <u>Ann Sigsbee, MD</u><br>8/13/99-5/12/04 | Narrative Reports, Office Notes | 25 pages |

Although there may be some duplication of the above with records already in the claim file, these records are submitted to be placed in the file as enclosed, grouped as an integrated and chronological record of treatment for Ms. Byrne's disabling medical conditions. These records are substantial evidence and are to be included, as submitted, for the record on any further appeal.

3.    **Medications**

Documentation pertaining to Ms. Byrne's regimen of medications is encloses as follows:

(a)    **Prescription**

| | | |
|---|---|---|
| <u>Dr. Sigsbee</u><br>5/13/04 | Flexeril | 1 page |

2

**(b)**     <u>**Drug Product Information**</u>

CanadaPharmacy.Com

| | |
|---|---|
| Atenolol | 2 pages |
| Lipitor | 2 pages |
| Flexeril | 2 pages |
| Vioxx | 2 pages |
| Prednisone | 2 pages |
| Paxil | 6 pages |

These documents are substantial evidence as to the effects of Ms. Byrne's medication on her ability to function as she describes in her Affidavit.   They are therefore submitted to be made part of the claim file and to be included in the record on any further appeal.

**4.**     <u>**Vocational Documents**</u>

The following vocational documents are copies taken from O\*Net Online and the Dictionary of Occupational Titles, Revised Fourth Edition, 1991.

**(a)**     <u>**O\*Net OnLine**</u>

| | |
|---|---|
| Homepage | 2 pages |
| About O\*Net | 2 pages |
| <u>Interviewer, 43-4111.00</u><br>Details Report (Includes Hospital Admitting Clerk) | 16 pages |
| <u>Bill & Account Collector, 43-3011.00</u><br>Details Report (Includes Hospital Billing Clerk) | 15 pages |
| <u>Order Clerk, 43-4151.00</u><br>Details Report | 16 pages |
| <u>Loan Interviewer & Clerk, 43-4131.00</u><br>Details Report | 16 pages |
| <u>Receptionist & Information Clerk, 43-4171.00</u><br>Details Report | 18 pages |
| <u>Medical Secretary, 43-6013.00</u><br>Details Report | 17 pages |

3

Medical Records & Health Info. Technician, 29-2017.00
Details Report                                                17 pages

Insurance Claims Clerk, 43-9041.01
Details Report                                                15 pages

**(b)    Dictionary of Occupational Titles (DOT)
         Fourth Revised Edition, 1991**

Vol. I
Title Page                                                    1 page
Prefatory Note                                                1 page
Parts of the Occupational Definition                          7 pages

Vol. II
Title Page                                                    1 page
Appendix B, Explanation of Data, People, Things               3 pages
Appendix C, Components of Definition Trailer                  6 pages

Medical Secretary, DOT 201.362-014
Definition                                                    1 page

Secretary, DOT 201.362-030
Definition                                                    1 page

Hospital Admitting Clerk, DOT 205.362-018
Definition                                                    1 page

Claims Clerk II, DOT 205.367-018
Definition                                                    1 page

Receptionist, DOT 237.367-038
Definition                                                    1 page

Mortgage Clerk, DOT 249.362-014
Definition                                                    1 page

Order Clerk, DOT 249.362-026
Definition                                                    1 page

The O*Net job definitions are current, based on semi-annual updates of all occupations by
a contractor with the U.S. Department of Labor, most recently in June 2004. The O*Net
definitions replace the outdated DOT definitions which were last revised in 1991. The
above O*Net definitions and explanatory pages are therefore submitted as substantial

4

evidence on vocational issues, to be placed in the claim file and to be included in the record on any further appeal. The enclosed DOT job definitions and explanatory materials are also submitted as substantial evidence, to be included in the record, as the vocational analyst employed by IDR to review this claim purported to rely on the selected DOT job definitions.

## B.    Discussion Of Issues

This appeal is taken from a termination of Ms. Byrne's long term disability claim, based on a disability which commenced in March 1998 after she fell at work and injured her back. It is argued below that the substantial evidence of record, including the documents filed herewith as well as documents already in the file, establish Ms. Byrne's disability under the Cape Cod Hospital disability plan. Indeed, her disability has already been established by reason of the initial allowance of the claim. It is further argued that there is no substantial evidence to support a finding that Ms. Byrne has medically improved to a point where she is capable of performing any gainful work activity.

### 1.    Definition of Disability & Standard of Review

IDR has provided us with a copy of the disability plan for Cape Cod Hospital employees. The definition of disability for non-professional employees, found in Section II of the Plan, is as follows:

> B.    TOTAL DISABILITY or TOTALLY DISABLED means during the elimination period and the next 36 months of disability the insured is:
>
> 1.    unable to perform all of the material and substantial duties of his occupation on a full-time basis because of a disability:
>
>     (a) caused by injury or sickness;
>     (b) that started while insured under this policy; and
>
> 2.    after 36 months of benefits have been paid, the insured is unable to perform with reasonable continuity all of the material and substantial duties of his own or any other occupation for which he is or becomes reasonably fitted by training, education, experience, age and physical and mental capacity.

As previously determined, Ms. Byrne has met the terms of Sect. 1, where her disability was caused by both injury and sickness which started while she was insured under the policy. It is argued below that she continues to meet the terms of both Sect. 1 and Sect. 2, where she cannot perform *with reasonable continuity* all of the material and substantial duties of her own or any other occupation for which she might otherwise be qualified.

5

As to proof of disability, in Section IV, the Plan provides that the Company will pay disability benefits when it "receives proof that an insured is disabled due to sickness or injury and requires the regular attendance of a physician." Further, the benefit will be paid for the period of disability if the insured gives to the Company proof of continued disability and regular attendance of a physician. The proof must be given upon request at the insured's expense. Ms. Byrne has met these requirements as well. The enclosed medical records clearly establish regular attendance of her treating physicians on a continuing basis through her most recent visit with Dr. Sigsbee in May 2004. And, again, there is no documentation of any significant improvement in Ms. Byrne's disabling symptoms.

On this point, as to proof of disability, there is no language in the policy which grants discretionary authority to the Company to determine the disability claim. Reference is made to proofs which must be submitted by the insured –which have been submitted on this claim, and it is the quality of the proofs submitted which will establish the disability claim, not the Company's discretionary evaluation of such proof.

In Section VI, Subsection F(2)(d), it is provided that proof must be given to the Company which covers the date disability started, the cause of disability and the degree of disability. Ms. Byrne's proof of disability meets these criteria. The reference to "satisfactory proof" in Subsection I clearly refers to proof which meets the criteria stated in the Plan, as it refers to the timing of payment on a claim and is not stated as part of the procedure for determining disability.

In these circumstances, any further review in federal court under ERISA will be based upon a *de novo* review of the evidence, and not a review under the deferential "arbitrary and capricious" standard. Nonetheless, the argument below is couched in terms of substantial evidence, as if the arbitrary and capricious standard applied. This does not in any way concede that such standard must apply if the claim is reviewed in federal court on an ERISA appeal, and in that event we will seek *de novo* review. The First Circuit Court of Appeals has held that the basic standard of review on any ERISA claim is "reasonableness," and it is under that standard that the termination of Ms. Byrne's LTD claim is in error.

## 2.    Substantial Evidence Of Continued Disability

The medical records submitted with this appeal are substantial evidence that Ms. Byrne has been continuously disabled from her own occupation and from any occupation from March 1998 through the present. The onset of disability has been established as March 1998, when Ms. Byrne was injured in a fall. The cause of disability is chronic pain and fatigue, resulting from several diagnoses including fibromyalgia, disc disease and diffuse arthralgias with intermittent episodes of synovitis. Ms. Byrne basically suffers from a chronic pain syndrome, as noted by Dr. Sigsbee on April 17, 2003, which results from a combination of her several diagnoses which are not mutually exclusive.

6

(a)    **Substantial Evidence Of Pain As A Disability**

Pain which prevents sustained functional activity in the workplace is by itself the disability, not the specific diagnosis which causes the pain.  Someone may have, for example, some degenerative disc disease which is asymptomatic and does not prevent him from working.  Then, a traumatic incident occurs which exacerbates the disease and causes symptoms which did not previously exist.  In this situation it the symptomology and not the disease which is disabling, and that is what happened to Ms. Byrne when she fell at work in March 1998.

In her narrative of September 24, 2001, Dr. Sigsbee made this point explicitly, stating that although she believed Ms. Byrne suffered from a low grade inflammatory arthropathy, "the majority of this patient's disability has been from a syndrome of pain and malaise." And the medical records from treating and examining physicians fully support the finding that Ms. Byrne is disabled by reason of her chronic pain syndrome, where she has presented repeatedly and consistently with observable signs of chronic pain which include limited range of motion, tenderness, intermittent swelling of joints.

It is significant in this context that Ms. Byrne has had one IME by Dr. Paul Lee, for the Massachusetts Rehabilitation Commission, who made careful observations of her during his examination on September 1, 1999.  Dr. Lee was a wholly disinterested examiner who was not involved in treating Ms. Byrne, and he commented specifically on the fact that she x "had difficulty standing or walking for longer than five minutes."  Dr. Lee noted that Ms. Byrne's gait was "very tentative," and she "appeared to be in pain" when she walked and to be favoring her back.  He stated that "it was obvious that she was in pain sitting on the examination table."

Dr. Johnson made similar observations during his examination of Ms. Byrne on May 19, 1998, where she was "walking very stiffly, barely moving her neck."  On June 27, 2002, Eileen Cullen, PT, of Physiotherapy Associates observed that Ms. Byrne "moves methodically" and "uses arms on chair to stand."  On April 17, 2003, Dr. Sigsbee noted that Ms. Byrne's gait looked good once she got going but she had significant difficulty rising from her chair in the waiting room.  On his Physician Statement of September 9, 2003, Dr. Berry observed that Ms. Byrne "ambulates with caution & slowly" and "appears in pain."

In addition to such non-clinical observations, the doctors have consistently made clinical findings consistent with Ms. Byrne's complaint of chronic pain.  Dr. Johnson found "marked limitation of motion of the neck and back," with "a lot of tenderness" in both shoulders, elbows, buttocks and in the lumbosacral muscles.  Dr. Lee found spasm in the paracervical muscles, tenderness in both shoulders, diminished motor strength of upper extremities due to pain and limited range of motion in the neck.  Ms. Cullen found limited range of motion and decreased strength on her examination of June 27, 2002.  Dr. Sigsbee found diffuse tenderness in the back, and distress with flexion, extension and straight leg raising on her exam on March 31, 2004.

7

With respect to Ms. Byrne's low back pain, Dr. Leaver's report of August 5, 1999, states that her MRI of the spine shows degenerative disease, with a calcified disc fragment at L4, L5 "well out into the root canal on the right side." Dr. Leaver commented that this finding, combined wither Ms. Byrne's history of prior back surgeries, and her fall in March 1998, "no doubt contribute to her back and leg problems." With respect to Ms. Byrne's fibromyalgia, the diagnosis was first made by Dr. Carl Sigsbee at Cape Cod Hospital on May 7, 1998, and the medical records from Dr. Trout and Dr. Ann Sigsbee also refer to fibromyalgia.

Dr. Ann Sigsbee's more recent records attribute Ms. Byrne's chronic pain and disability to back pain of mechanical origin, which is consistent with Ms. Byrne's history as stated on her Affidavit that she suffers continually from the back pain but only occasionally suffers a flare-up of her fibromyalgia. In her most recent narrative, dated March 31, 2004, Dr. Sigsbee commented that Ms. Byrne continues to show intermittent signs of synovitis affecting the wrists and hands, in addition to "chronic back pain."

In his Attending Physician Statement of 8/23/00, Dr. Berry describes Ms. Byrne's disabling diagnoses as being twofold, including "chronic back *pain*" and "fibromyalgia *pain,*" with throbbing of joints, difficulty with activities of daily living and muscle weakness. (Emphases are added). Dr. Berry commented that Ms. Byrne had showed no improvement over the past year and was "not likely to return to work." He indicated that she was not a suitable candidate for further rehabilitation for either her own job or any other job.

In his Physician Statement of 9/9/03, Dr. Berry again referred to both fibromyalgia and "chronic back pain," with muscle weakness and joint pain. He indicated that Ms. Berry could sit, stand or walk only for one hour maximum in an 8-hour workday and could not use her hands for pushing/pulling or fine manipulation.

In his Physical Capacities Assessment of 10/1/03, Dr. Berry indicated that Ms. Byrne could lift and carry a maximum of 10 lbs. only occasionally, could only occasionally, i.e. up to a maximum of 33 percent of the time, maintain extend her hands and arms, handle objects or do work with her fingers, including keyboard work. He also indicated that Ms. Byrne could never stoop or bend at the waist or knees, could never crouch and could never reach above her shoulders. Again, he indicated that Ms. Byrne was limited to one hour sitting, standing or walking, on an intermittent basis, during an eight hour workday. He indicated that Ms. Byrne could not use her hands for simple grasping, firm grasping or fine manipulation, and could not use either foot for repetitive activity. He indicated that Ms. Byrne was limited to driving only short distances, with a minimal amount of sitting. He indicated that these functional restrictions were permanent, and they prevented Ms. Byrne from returning to work full time at any occupation. All of these restrictions are due to Ms. Byrne's chronic symptoms including her lower back pain and fibromyalgia pain.

8

In his Functional Capacities Assessment of 10/1/03, Dr. Berry states that his evaluation of Ms. Byrne's disability is based on three factors: "Patient Report," "Clinical Experience" and "Reports from other specialist." Dr. Berry's finding of disability is thus based on his clinical observations of Ms. Byrne, his review of reports on referral from other treating physicians and Ms. Byrne's own account of her symptoms and limitations. This includes Ms. Byrne's own account of her activities of daily living, as indicated on Dr. Berry's Attending Physician's Supplemental Statement of 8/23/00, which refers to Ms. Byrne's "difficulty with ADL's."

In this context, Dr. Berry's finding as to Ms. Byrne's disability is of a consistent whole, based on his own clinical findings, the reports made to him by his colleagues who are involved in Ms. Byrne's treatment and Ms. Byrne's own account of her symptoms and daily activities –as opposed to any second-level hearsay as to her symptoms and activities. And Ms. Byrne's account of her symptoms and activities, as stated on her sworn affidavit, are consistent with Dr. Berry's assessment of total disability stated most recently in October 2003. Dr. Berry's APS and Functional Capacities Evaluation are clearly substantial evidence of Ms. Byrne's continuing disability due to chronic pain related to her low back impairment and/or her fibromyalgia.

**(b)    Substantial Evidence Of Fatigue As Contributing To Disability**

Ms. Byrne has complained of fatigue and sleep disturbance repeatedly during her period of disability which began in March 1998. On May 7, 1998, she complained to Dr. Carl Sigsbee at Cape Cod Hospital of "pain and difficulty with sleep." Dr. Sigsbee found "evidence of . . . sleep disturbance." On May 8, 1998, Ms. Byrne complained to Dr. Berry of both pain and "inability to sleep," and he commented again on January 22, 2003, on Ms. Byrne's complaint of "feeling tired."

On September 1, 1999, Dr. Lee noted that Ms. Byrne's "most troublesome symptom is her extreme fatigue." He noted that she "wakes up in the morning tired and goes to bed tired. She also requires several naps during the day because of her extreme fatigue."

On September 24, 2001, Dr. Ann Sigsbee commented on Ms. Byrne's "sleep disorder" and "general malaise." On June 27, 2002, Eileen Cullen, PT, reported that Ms. Byrne "tires easily" and "feels weak." On September 10, 2003, Dr. Sigsbee again referred to Ms. Byrne's "fatigue" and "malaise," and as recently as March 31, 2004, Dr. Sigsbee referred to Ms. Byrne's complaint of "chronic fatigue" and "malaise."

The substantial evidence thus supports a finding that Ms. Byrne suffers from sleep disturbance and fatigue which compound the disabling effects of her chronic pain syndrome. As Dr. Lee observed in September 1999, Ms. Byrne takes naps during the day due to her chronic fatigue, and this is verified by Ms. Byrne's sworn affidavit as enclosed.

9

**(c)    Substantial Evidence Of Disabling Side Effects Of Medication**

Ms. Byrne has complained of the disabling side effects of her several prescription drugs.  She referred to this generally on her Claimant Statement of 6/18/00, and her sworn affidavit, as filed herewith, details side effects such as lethargy, dizziness, headache, increased fatigue, blurry vision and upset stomach associated with her taking Atenolol, Flexeril, Levoxyl, Paxil, Prednisone and Vioxx.   She also suffers exacerbation of her low back symptoms when taking Lipitor due to increased bowel gas pressure.  The side-effects described by Ms. Byrne are consistent with the enclosed drug product information printouts for these medications.

The enclosed prescription for Flexeril from Dr. Sigsbee, dated 5/13/04, shows that Ms. Byrne remains current with her pain medication.  And this drug, along with Paxil, were listed by Dr. Berry on his Physical Capacities Assessment of 10/1/03 as adversely affecting Ms. Byrne's ability to work.  The substantial evidence thus supports a finding that Ms. Byrne is disabled from doing any substantial gainful activity by reason of the side effects of her prescription drugs, in addition to her chronic pain and fatigue.

**(d)    Substantial Evidence Of Disability From Sedentary Work Activity Due To Exertional Impairments Caused By Chronic Pain**

The substantial medical evidence as summarized above clearly supports a findng that Ms. Byrne cannot perform even sedentary work activity due to her chronic pain syndrome.  As indicated by the DOT definition, at Appendix C, page 1013, sedentary work requires "sitting most of the time" with walking or standing for only brief periods of time.  As indicated by Dr. Berry's Physical Capacities Assessment, Ms. Byrne cannot sit, stand or walk for "most of the time" during an eight hour workday, as she is restricted to only 1 hour total for each of these functions.

Although Dr. Berry indicated that Ms. Byrne might "occasionally" lift or carry up to 10 lbs. maximum, which is consistent with the definition of sedentary work, he also indicated that she could only occasionally extend her hands and arms in any direction, or use her hands for seizing, holding, grasping or turning objects, or use her fingers for picking, pinching or using a keyboard.  He also indicated that Ms. Byrne could not use her hands at all for firm grasping or fine manipulation.  But the DOT definition for sedentary activity states that in addition to occasional lifting of up to 10 lbs., a worker must be able to "frequently" use the hands to lift, carry, push, pull or otherwise move objects, which is beyond Ms. Byrne's capacity as assessed by Dr. Berry.

Here, Dr. Berry's functional capacities assessment is substantial evidence to support the finding that Ms. Byrne does not have the exertional capacity to perform sedentary work activity as that is defined by the Department of Labor in the DOT.

10

**(e)** **Substantial Evidence Of Disability From Sedentary Work Activity Due To Combined Exertional And Non-Exertional Impairments**

Ms. Byrne's capacity to perform sedentary work is restricted by the physical effects of her chronic pain, which precludes prolonged sitting and significant use of the hands. In addition, it is also compromised by her chronic fatigue and the mental side-effects of her pain medication, including Flexeril and Paxil.

Although Ms. Byrne's favorable determination of disability by the Social Security Administration is not binding on an ERISA disability claim, the disability regulations, insofar as they may be applicable to the specific facts of the claim, are relevant as substantial evidence in this context.

Here, 20 C.F.R. Part 404, Subpart P, Appendix 2, Sect. 201.00(h), states that when an individual is precluded by non-exertional impairments from performing the full range of sedentary work, by the loss of bilateral manual dexterity for example, a finding of disabled is required. This section is part of the so-called "Grid" regulations which have been recognized by the Supreme Court as findings of administrative fact based on Department of Labor definitions and standards.

As such, this section is relevant, substantial evidence on vocational issues on an ERISA disability claim. For example, a vocational consultant for the disability insurer cannot be heard to say that a claimant can perform sedentary jobs as defined by the Department of Labor when the Department itself, in consultation with the Social Security Administration, has determined that the claimant's non-exertional impairments preclude the performance of sedentary work.

Therefore, in addition to the fact that Dr. Berry's functional capacities assessment indicates that Ms. Byrne does not have the physical capacity for sedentary work as defined, the substantial evidence also establishes that she is disabled from performing sedentary work by reason of the non-exertional impairments caused by chronic fatigue and medicinal side effects.

The record contains substantial evidence of such non-exertional impairments, with no contrary evidence, and therefore such impairments cannot be discounted or overlooked in determining whether Ms. Byrne continues to be disabled under the CCH Plan. There is no medical evidence to suggest that Ms. Byrne is not impaired by the side effects of her pain medication as she and Dr. Berry indicate, and there is no evidence that she does not suffer from chronic fatigue as she has indicated repeatedly to her treating and examining doctors and as stated on her sworn affidavit.

11

3.    **No Substantial Evidence To Support A Finding Of Non-Disability**

As discussed above, there is substantial medical and vocational evidence to require a finding that Ms. Byrne is disabled from performing any substantial gainful activity, and her disability continues.   It is argued further that there is no substantial evidence to support the determination that Ms. Byrne is no longer disabled under the CCH Plan.

(a)    **The Medical Consultant's Report Is Not Substantial Evidence To Support A Finding Of Non-Disability Under The CCH Plan Because It Is Based On Multiple Errors Of Fact.**

The finding that Ms. Byrne's disability has ended is supported primarily by the report of a medical consultant, Richard Herman, MD.   Dr. Herman's report is not substantial evidence of non-disability.   Substantial evidence is such proof as a reasonable mind might accept as adequate to support a conclusion, although it need not be compelling.   In this case, Dr. Herman's report is neither compelling nor adequate to support his conclusion of non-disability.

Review of Dr. Herman's report must begin with the fact that he makes several misstatements as to Ms. Byrne's history, complaints and level of activity.   This is not to impugn Dr. Herman's integrity, but he is relying on second-level hearsay based largely on an error-prone report by Ms. Terry Wiley and has never examined or spoken with Ms. Byrne.

Dr. Herman makes much of the allegation that Ms. Byrne rides a bike for two or three miles.   That is simply false, as stated on Ms. Byrne's sworn affidavit.   She rides her bike on flat, paved roads for two or three blocks in her immediate neighborhood.   This is for a maximum of fifteen minutes at one time.   She also has used a stationary bike for exercise, for five minutes at a time.   This exercise, as well as swimming, was prescribed by her treating physician, Dr. Ann Sigsbee.   Dr. Herman in this instance relied on the report of Status Phone Call of 10/30/03 by Ms. Terry Wiley but, as stated by Ms. Byrne on her sworn affidavit, Ms. Wiley did not correctly report what Ms. Byrne said on this point.

Dr. Herman questions the diagnosis of fibromyalgia based on the allegation that Ms. Byrne does not suffer from sleep disturbance or significant fatigue.   But this is contrary to the substantial medical evidence submitted herewith, where Ms. Byrne began to complain of sleep disturbance in May 1998 and has continued to complain of difficulty sleeping and chronic fatigue.   Whether or not these problems are related to a diagnosis of fibromyalgia or to some other cause, the chronic fatigue still exists as a factor which disables Ms. Byrne from performing a full range of sedentary work.

Dr. Herman purports to find a discrepancy between Dr. Berry's RFA as to Ms. Byrne's limited use of hands and the fact that she does some light housework, but there is no discrepancy here.   Dr. Berry found a total restriction from firm grasping and fine

12

finger dexterity, but found that Ms. Byrne could use her hands "occasionally" for near reaching, seizing, holding, grasping or turning with the hands and picking, pinching or otherwise working with her fingers. Here, there is absolutely no discrepancy with Ms. Byrne's actual level of function in terms of the limited housework she does.

The restriction to occasional use of hands and arms, as indicated by Dr. Berry, means that Ms. Byrne has the capacity to perform such activity up to but no more than one-third of an 8-hour workday. This limitation, as discussed above, means that she cannot perform sedentary work as defined in the DOT, because sedentary jobs require the ability to perform such activity on a frequent basis. But the limited amount of light housework Ms. Byrne does, as described in her sworn affidavit, is clearly consistent with her restriction to only occasional use of the hands as indicated by Dr. Berry.

Dr. Herman states that Ms. Byrne walks on the beach for one-and-a-half miles several times a week. Again, this is misinformation based on Ms. Wylie's report of the Status Phone Call on 10/30/03. As Ms.Byrne's sworn affidavit makes clear, she *drives* a distance of a mile and a half to the beach and then walks for no more than fifteen minutes total on her best days. The only contradiction here appears in Ms. Wylie's reporting. Ms. Wylie accurately records Ms. Byrne's statement that she takes several short walks daily, less than 1/8 of a mile, and can only walk for ten to fifteen minutes at a time, but then she erroneously states that Ms. Byrne walks a mile and a half to the beach several times a week.

Dr. Herman states that Ms. Byrne "can perform all of her ADL's " (sic), again relying on Ms. Wylie's report of the Status Phone Call. As Ms. Byrne's sworn affidavit makes clear, she cannot perform all of her normal activities of daily living based on her predisability level of function. She tries to do as much as she can, which exhausts her and requires that she take naps after only an hour or so of activity. Here, Dr. Herman took Ms. Wylie's report as suggesting that Ms. Byrne does much more than she can do, while Ms. Byrne's actual level of function is entirely consistent with her disability from even sedentary work as discussed above.

Ms. Wylie is clearly mistaken as to what Ms. Byrne told her, as Ms. Byrne's sworn affidavit makes clear, and although Dr. Herman cannot be faulted for Ms. Wylie's error, his conclusions as to Ms. Byrne's level of function based on such erroneous information cannot stand as substantial evidence. Dr. Herman's conclusions are in error, as contrary to the competent sworn statement of Ms. Byrne, and they are based on second-level hearsay from Ms. Wylie. And his in his purported discussion with Dr. Berry, he compounded the error by misinforming Dr. Berry with third-level hearsay.

Thus, while Dr. Herman claims that Dr. Berry re-evaluated his position as to Ms. Byrne's disability "when he learned of the insured's level of activity during her daily life." Dr. Herman claims that he sent a letter to Dr. Berry to be signed as confirming their conversation, but the copy of the claim file provided to us on request did not contain such

13

letter as signed by Dr. Berry. And even if Dr. Berry has signed a copy of Dr. Herman's letter, that would not be substantial evidence of non-disability because it was based on several erroneous factual assumptions.

**(b)** **The Medical Consultant's Report Is Not Substantial Evidence Of Non-Disability Under The CCH Plan Because It Does Not Establish That Claimant Can Perform Sedentary Activity As Defined In The DOT**

Dr. Herman's report makes a conclusory statement that Ms. Byrne can perform "sedentary" work activity, but there is no indication as to Dr. Herman's awareness of the specific functional requirements of sedentary activity nor any specific functional findings which relate to such requirements.

Dr. Herman states that Ms. Byrne has sedentary work capacity, "as long as she is not required to do prolonged sitting, standing, walking, and can change position as needed," but he makes no finding contrary to Dr. Berry's prior assessment that Ms. Byrne is restricted to one hour of sitting, one hour of standing and one hour of walking in an 8-hour workday. Without such contrary finding, there is no substantial medical evidence that Ms. Byrne can perform sedentary work activity as defined by the DOT, which requires "sitting most of the time," with only very limited standing or walking.

Further, although Dr. Herman purported to find a discrepancy between Ms. Byrne's actual use of hands and Dr. Berry's prior restriction on her ability to use her hands, there is no such discrepancy. Dr. Berry's prior determination that Ms. Byrne was restricted to only occasional use of the hands is entirely consistent with Ms. Byrne's actual use of hands to perform limited housework on an occasional basis during the day. And this limitation to occasional use of hands on objects weighing less than 10 lbs. precludes Ms. Byrne from performing sedentary work as defined by the DOT which requires frequent use of hands to manipulate and handle objects throughout an 8-hour workday.

For these reasons, Dr. Herman's report is not substantial medical evidence that Ms. Byrne can perform sedentary work activity as defined by the DOT, even if it were based on correct assumptions as to her actual level of function in performing daily activities. Since the ability to perform at least sedentary work activity is essential to a finding of non-disability, Dr. Herman's report is not substantial evidence supporting the termination of Ms. Byrne's long term disability claim.

Substantial evidence means such evidence as a reasonable mind might accept as supporting a conclusion. But where the specific parameters of Dr. Herman's conclusion that Ms. Byrne has sedentary work activity do not conform to the express requirements for sedentary work as defined by the Department of Labor, Dr. Herman's report cannot be reasonably relied on as establishing that Ms. Byrne is no longer totally disabled under the CCH long term disability plan.

**(c)    The Vocational Consultant's Report Is Not Substantial Evidence
That Claimant Can Perform Any Occupation For Which She
Might Be Qualified By Training, Education, Or Experience**

The vocational consultant's report is deficient in several respects. It is not supported by competent medical evidence that Ms. Byrne can perform sedentary work activity as defined by the Department of Labor. It does not take account of Ms. Byrne's non-exertional impairments of chronic fatigue and medicinal side-effects. It does not accurately account for the physical requirements of the sedentary jobs for which Ms. Byrne's experience might qualify her, and it is based on outdated job definitions from the 1991 Revised Edition of the DOT.

**( i )    The Vocational Consultant's Report Is Not Based On Substantial
Medical Evidence Of Claimant's Capacity For Sedentary Work**

Mr. Violetta's report is based on Dr. Herman's medical finding that Ms. Byrne can perform sedentary work activity, but that medical finding is not substantial evidence because it does not conform with the definition of sedentary work as promulgated by the Department of Labor as discussed above. Therefore, Mr. Violetta's vocational analysis cannot be relied on as substantial evidence of non-disability.

The only competent assessment in the file of Ms. Byrne's specific functional capacity is Dr. Berry's RFA, which restricts her to only one hour sitting in an 8-hour work day, one hour standing and one hour walking. On this assessment, Ms. Byrne clearly cannot perform any job requiring sedentary work activity as defined by the DOT to include sitting most of the time.

Mr. Violetta may be qualified to render an opinion on the availability of jobs for someone with sedentary work capacity as defined by the Department of Labor, but he is not competent to make the medical determination that Ms. Byrne has such sedentary work capacity, contrary to Dr. Berry's RFA. Only a medical doctor can make that determination, and such determination must be made on the record by a competent physician in order for a vocational analyst to render an opinion as to the disability claimant's ability to perform specific sedentary jobs. But there is no such determination in the claim file and for this reason Mr. Violetta's report cannot be relied upon as substantial evidence of non-disability.

**( ii )    The Vocational Consultant's Report Fails To Take Account Of
Relevant Non-Exertional Impairments Which Compromise
The Claimant's Capacity To Perform Sedentary Work**

There is substantial medical evidence in the file, as discussed above, that Ms. Byrne is significantly impaired by non-exertional factors including chronic fatigue and the side-effects of her pain medication in addition to the chronic pain which restricts her to

15

less than sedentary activity. Ms. Byrne's affidavit details how these factors affect her mental functioning and her ability to perform on a sustained basis. There is no substantial medical evidence to indicate that Ms. Byrne does not suffer from chronic fatigue, as repeatedly diagnosed by Dr. Sigsbee, and there is no substantial medical evidence to indicate that Ms. Byrne does not suffer significant side effects from her pain medication, as corroborated by Dr. Berry.

The jobs listed by Mr. Violetta include secretarial work and clerical work. But the mental requirements of such jobs, as rated by both O*Net and the DOT definitions are demanding and there is no analysis by Mr. Violetta as to how Ms. Byrne's fatigue or medicinal side effects will allow her to meet the mental demands of such work. The O*Net ratings for these jobs, for example, all require a high level of Attention to Others, Reading Comprehension, Clerical Ability, Information Processing and Numerical Ability. The DOT definitions for these jobs, as rated by the fourth digit, all require a relatively high level of data use described as analyzing (2) or compiling (3). See Vol. I, page xix. These requirements are consistent with, but less detailed than the requirements listed by O*Net.

Mr. Violetta's report makes no mention of the mental demands of the sedentary jobs he lists or of Ms. Byrne's non-exertional limitations caused by chronic fatigue and medicinal side-effects. His report, therefore, cannot be relied upon as substantial vocational evidence because of his failure to account for this vocationally significant factor which compromises Ms. Byrne's ability to perform even sedentary work.

### (iii)    The Vocational Consultant's Report Fails To Take Account Of The Claimant's Postural And Manual Restrictions Which Preclude Her From Performing Even Sedentary Jobs As Defined In The DOT

Mr. Violetta's vocational analysis purports to be based on Ms. Byrne having the exertional capability to perform jobs as defined in 1991 Edition of the DOT. But that analysis is in error, where he fails to take account of Ms. Byrne's severely limited ability to use her hands only occasionally for manipulating objects weighing under 10 lbs. and her total inability to use her hands for tasks requiring grip strength and/or fine finger manipulation.

The DOT definition for sedentary jobs, in addition to a requirement for sitting most of the time, requires that the worker be able to use both hands on a frequent basis for manipulating objects of negligible weight. Ms. Byrne can do this only on an an occasional basis, and therefore she cannot perform sedentary work as defined in the DOT. Mr. Violetta's report is therefore cannot be relied on as substantial evidence that Ms. Byrne might perform any of the sedentary occupations he describes.

16

Further, Mr. Violetta's report fails to take account of Ms. Byrne's postural restrictions, as specified by Dr. Berry and as acknowledged by Dr. Herman, which preclude any bending, stooping, kneeling or crouching. These restrictions are tacitly recognized by Ms. Wiley in her report of Status Phone Call, where all of the daily activities performed by Ms. Byrne are done from the waist up. But Ms. Byrne's restrictions postural restrictions clearly prevent her from performing any of the sedentary jobs listed by Mr. Violetta, all of which require bending, stooping, kneeling or crouching to some degree as specified by the more complete and up-to-date O*Net definitions.

Under the heading of Work Context, O*Net rates such postural requirements for these jobs by degree of importance ranging from 5 to 32, but Ms. Byrne's capacity for such postural requirements as rated by Dr. Berry's RFA, and as agreed to by Dr. Herman, is zero. They are as follows:

| Kneeling, Crouching, Stooping | O*Net Rating |
|---|---|
| Interviewer | 5 |
| Billing & Accounting Clerk | 10 |
| Information Clerk | 10 |
| Insurance Clerk | 13 |
| Loan Clerk | 15 |
| Order Clerk | 20 |
| Medical Record Clerk | 22 |
| Medical Secretary | 27 |

| Bending & Twisting | |
|---|---|
| Interviewer | 10 |
| Order Clerk | 10 |
| Loan Clerk | 13 |
| Insurance Clerk | 13 |
| Billing & Accounting Clerk | 15 |
| Information Clerk | 18 |
| Medical Secretary | 31 |
| Medical Records Clerk | 32 |

All of the sedentary jobs listed by Mr. Violetta, as defined by the more complete and up-to-date O*Net definitions thus require bending, twisting, kneeling, crouching and/or stooping to some degree, and Ms. Byrne is therefore incapable of performing such jobs due to her total restriction from such postural requirements.

17

Several of the sedentary jobs listed by Mr. Violetta also involve working in cramped, uncomfortable workspaces.  They include:

| Job | O*Net Rating |
| --- | --- |
| Information Clerk | 6 |
| Billing & Accounting Clerk | 10 |
| Medical Secretary | 34 |
| Medical Record Clerk | 34 |

This is a further basis on which Ms. Byrne is precluded from performing such sedentary jobs by reason of her severe postural restrictions.

Also, all of the sedentary jobs listed by Mr. Violetta require significant use of the hands as defined by O*Net.   But Ms. Byrne is restricted to only occasional use of the hands as assessed by Dr. Berry and as consistent with her actual level of daily activities. The ratings for use of hands are as follows:

| Job | O*Net Rating |
| --- | --- |
| Billing & Accounting Clerk | 30 |
| Insurance Clerk | 33 |
| Information Clerk | 33 |
| Interviewer | 35 |
| Order Clerk | 40 |
| Information Clerk | 41 |
| Medical Records Clerk | 59 |
| Medical Secretary | 82 |

Again, this is a further basis on which Ms. Byrne is precluded from performing the sedentary jobs listed by Mr. Violetta by reason of her specific functional restrictions as assessed by Dr. Berry's RFA.

Also, in this context, Mr. Violetta's assertion that the sedentary jobs he listed might somehow permit the worker to change positions at will cannot pass without objection. None of the DOT definitions or the O*Net definitions for such jobs indicate that the worker can sit or stand at will.   To the contrary, the DOT definition for sedentary work expressly states that the worker must be sitting most of the time, and this is confirmed by the O*Net Work Context ratings for these jobs as to required sitting.

An expert is not needed to realize that a billing clerk or secretary who must type voluminous medical reports, account statements or insurance claim evaluations, under a deadline, cannot do such work standing up and cannot simply tell her supervisor that she must stop at will every 15 to 20 minutes and take a five or ten minute break walking around

the office. That claim by Mr. Violetta defies common knowledge of the average workplace and it defies common sense.

What is true, as indicated by the O\*Net definitions for these sedentary jobs is that some standing and walking is *required*, as opposed to permitted. And again, both common sense and common experience tell us that this is not at the worker's discretion. When the supervisor tells a clerk to stand at the counter for an hour to greet patients or to receive payment from insureds, the clerk cannot simply tell the supervisor that she must stop at will and leave the patients or customers standing while she sits for five or ten minutes.

Moreover, in the present case, Ms. Byrne's need to change position at will includes the need to recline at rest several times a day. This is supported by Dr. Berry's RFA which restricts her to only one hour each of sitting, standing or walking on an intermittent basis during an 8-hour workday. But there is no job, as defined in either the DOT or O\*Net, which allows a worker to take several naps during the workday. Workers who do this typically get fired for sleeping on the job.

**(iv)     The Vocational Consultant's Report Is Based On Outdated Job Definitions From The 1991 Edition Of The DOT And Does Not Adequately Take Account Of Such Jobs As They Exist Today**

The Prefatory Note at page v of the 1991 Revised Fourth Edition of the DOT states that it had then been fourteen years since the release of the original Fourth Edition. During that time the American workplace had undergone a "revolutionary change," which required a revision of the DOT job definitions. That was thirteen years ago, and the American workplace has continued to change dynamically as to the required skills and abilities for all but the most menial jobs. And this is particularly true in context of clerical and secretarial jobs where there has been a rapid and complete transition from manual data processing to electronic data processing. This is reflected in the differences between the DOT definitions for the sedentary jobs listed by Mr. Violetta and the O\*Net definitions with respect to computer use.

None of the DOT definitions for these jobs makes any reference to using computers. By contrast, all of the O\*Net definitions for these jobs assign a significant degree of importance to use of computers. And this is an important factor in light of Ms. Byrne's postural restrictions. Dr. Berry' RFA states that Ms. Byrne must be able to change position as needed, and Dr. Herman concurs with this. But computer tasks often require prolonged sessions sitting at the console, doing work that cannot be performed standing up. One need only try to work at a PC in the standing position once to realize that this puts a great deal of strain on even a healthy back. Thus, Mr. Violetta's reliance on the DOT definitions for the sedentary jobs he lists cannot be relied upon as substantial evidence because those definitions are out of date and do not accurately reflect this major change in the average American workplace.

19

C.    **Conclusion:   The Termination Of Ms. Byrne's Disability Claim Is Not Supported By Substantial Evidence And Must Be Reversed With Resumption Of Monthly Benefits And Payment Of Past Due Benefits**

Based on the foregoing discussion, and the documents submitted herewith, we assert that the termination of Ms. Byrne's long term disability claim was in error and was not supported by substantial evidence.    We assert that it was unreasonable under the "arbitrary and capricious" standard of review, but reserve our right to have the claim reviewed under the less stringent *de novo* standard if an ERISA appeal to federal court must be taken.

We therefore demand that Ms. Byrne be restored to disability status under the CCH Plan, with monthly benefits to resume and with a lump sum payment of all past due benefits back through January 2004.   Thank you.

Richard K. Latimer
Attorney for Marilyn Byrne

RKLme
encs.